IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02722-MJW

MAGDELINE B. BERUMEN,

Plaintiff(s),

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

Defendant(s).

---

## ORDER AFFIRMING ALJ'S DECISION DENYING SOCIAL SECURITY BENEFITS

---

**MICHAEL J. WATANABE**
**United States Magistrate Judge**

Upon consent of the parties and pursuant to the Order of Reference dated August 14, 2014 (Docket No. 22), this civil action was referred to the Magistrate Judge "for all purposes" pursuant to the Pilot Program to Implement the Direct Assignment of Civil Cases to Full Time Magistrate Judges and Title 28 U.S.C. § 636(c).

In this case, plaintiff, Magdeline B. Berumen, challenges the final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for Supplemental Security Income benefits ("SSI") and disability insurance benefits ("DIB") pursuant to Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 405(g) and 1383(c)(3).  Plaintiff applied for SSI and DIB on February 12, 2008 (AR 432), alleging a disability onset date of April 4, 2007.[1]  After a hearing before Administrative

---

[1] Plaintiff later amended the alleged onset date to July 3, 2007.  (See Docket No. 10-2 at 31-32, 10-9 at 18).

2

Law Judge ("ALJ") Kathryn Burgchardt, plaintiff's claim was denied in a written decision dated December 6, 2010 (AR 9-18).  The Appeals Council ("AC") denied plaintiff's Request for Review.  Plaintiff then commenced an action in this court (Civil Action No. 11-cv-02591-JLK), and the Commissioner voluntarily remanded the case for a new hearing before the ALJ.  (Docket No. 10, Administrative Record "AR" 487).  The AC thus vacated the Commissioner's final decision and remanded the case to an ALJ for resolution of specified issues.  (AR 487-89).  ALJ Burgchardt then held another hearing and on March 18, 2013, issued another written decision denying plaintiff's claim.  (AR 432-43 - hereinafter "Docket No. 10-9").  The AC then found that the ALJ's decision complied with the court's and the AC's remand order and that plaintiff's exceptions provided no basis for changing the ALJ's decision.  (AR 416-17).  Accordingly, the ALJ's March 18, 2013, decision is the final decision of the Commissioner.

Plaintiff now appeals that final decision.  More specifically, plaintiff raises the following arguments in support of her contention that the ALJ committed errors in rendering her decision: (1) the ALJ did not properly assess plaintiff's physical impairments, (2) the ALJ did not properly account for the deficits in concentration that she found plaintiff to have; (3) the ALJ's limitation to unskilled work is not supported by any evidence in the record; (4) the ALJ's physical restrictions are not supported by any evidence in the record; and (5) the ALJ failed to account for the limitations resulting from plaintiff's severe impairment of headaches.  Several of these arguments overlap, so they will not be addressed individually.

The court has very carefully reviewed the Complaint (Docket No. 1), defendant's Answer (Docket No. 9), plaintiff's Opening Brief (Docket No. 13), defendant's Response

Brief (Docket No. 14), plaintiff's Reply Brief (Docket No. 17), the entire case file, the

administrative record ("AR" - Docket No. 10), and the applicable case law, statutes, and

regulations.  The court now being fully informed makes the following findings,

conclusions of law, and Order.  The court finds, substantially for the reasons stated in

the defendant's Response Brief (Docket No. 14), that the ALJ's decision denying

benefits should be affirmed.  The court adopts and incorporates the Statement of the

Facts section contained in the defendant's Response Brief.

## STANDARD OF REVIEW

This court's review of the ALJ's determination is limited to determining whether

the ALJ's decision is supported by substantial evidence and whether the Commissioner,

through the ALJ, applied the correct legal standards.  See Wall v. Astrue, 561 F.3d

1048, 1052 (10th Cir. 2009).  "Substantial evidence is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.  It requires more

than a scintilla, but less than a preponderance."  Id. (quoting Lax v. Astrue, 489 F.3d

1080, 1084 (10th Cir. 2007)).  "Evidence is not substantial if it is overwhelmed by other

evidence in the record."  Grogan v. Barnhart, 399 F.3d 1257, 1261-62 (10th Cir. 2005).

In reviewing the record and the arguments of counsel, the court does not reexamine the

issues de novo, Sisco v. United States Dep't of Health & Human Servs., 10 F.3d 739,

741 (10th Cir. 1993), nor does it re-weigh the evidence or substitute its judgment for that

of the Commissioner, Salazar v. Barnhart, 468 F.3d 615, 621 (10th Cir. 2006).  Thus,

even when some evidence may have supported contrary findings, the court "may not

displace the agency's choice between two fairly conflicting views," even if the court may

have "made a different choice had the matter been before it de novo."  Oldham v.

4

<u>Astrue</u>, 509 F.3d 1254, 1257-58 (10th Cir. 2007).  This court has applied this standard

to each of the challenges raised by plaintiff in this appeal.

An individual "shall be determined to be under a disability only if [her] physical or

mental impairment or impairments are of such severity that [she] is not only unable to

do [her] previous work but cannot, considering [her] age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the

national economy . . . ."  42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).  The Commissioner

has developed a five-step sequential evaluation process for determining whether a

claimant is disabled under the Act.  <u>See</u> <u>Williams v. Bowen</u>, 844 F.2d 748, 750-52 (10th

Cir. 1988) (describing the five steps in detail).  "If a determination can be made at any of

the steps that a claimant is or is not disabled, evaluation under a subsequent step is not

necessary."  <u>Id.</u> at 750. "The claimant bears the burden of proof through step four of the

analysis."  <u>Neilson v. Sullivan</u>, 992 F.2d 1118, 1120 (10th Cir. 1993).  At the fifth step,

the burden shifts to the Commissioner to show that the claimant can perform work that

exists in the national economy.  <u>Id.</u>

Here, at step one, the ALJ determined that the plaintiff has not engaged in

substantial gainful activity since April 4, 2007, the original alleged onset date.

At step two, the ALJ found that the plaintiff has the following severe impairments:

fibromyalgia, asthma, migraine headaches, and anxiety.  (Docket No. 10-9 at 21).  The

ALJ noted that these impairments are severe in combination as they cause more than

minimal functional limitations.  In addition, the ALJ noted that plaintiff has been treated

for gastroesophageal reflux disease ("GERD"), and the evidence shows a right heel

injury in 2006.  Nevertheless, the ALJ further noted that plaintiff's testing with regard to

5

GERD was absent any significant findings, and recommendations included using Prevacid and following a high-fiber, anti-reflux diet. In addition, the heel injury resolved, and subsequent records documented no on-going difficulties attributed to that injury. Therefore, the ALJ found those two conditions to be non-severe.

Next, at step three of the sequential evaluation process, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments contained in the Listings. In this regard, the ALJ specifically noted that she reviewed Listing 3.03 in connection with plaintiff's asthma, but she found plaintiff's asthma did not meet or medically equal the Listing because the evidence does not contain respiratory findings of the required severity. In addition, the ALJ noted that no specific Listing applies to plaintiff's headaches or fibromyalgia, but the ALJ took note of the requirements of a Social Security Ruling ("SSR") (12-2p), as well as Dr. Timms' assessment that plaintiff had a history suggestive of fibromyalgia and Dr. Milligan's listing fibromyalgia as a diagnosed condition. The ALJ further noted that in light of the medical records listing fibromyalgia as a condition, she considered plaintiff's fibromyalgia in rendering her residual functional capacity ("RFC") assessment, which incorporated both exertional and non-exertional limitations.

In addition, the ALJ found that the severity of plaintiff's mental impairments did not meet or medically equal the criteria of Listings 12.04 or 12.06. In this regard, the ALJ noted that plaintiff has been assessed with anxiety and depression, which satisfy the "paragraph A" requirements of those Listings. She then considered the "paragraph B" criteria, which she detailed. However, she determined that the evidence here

revealed at most mild limitation in activities of daily living and social functioning,
moderate limitation in maintenance of concentration, persistence, and pace, and no
episodes of decompensation of any duration.  In particular, the ALJ noted that plaintiff
had previously testified in 2010 that she resides in a house by herself and is a divorced
mother of four children.  Her two oldest live outside the home, and she sees them, along
with her grandchild, on occasion.  The youngest two reside primarily with their father but
do spend two nights per week with the plaintiff.  Plaintiff informed examiner Brett
Valette, Ph.D., that she does light housekeeping, small loads of laundry, and drives a
car.  Socially she sees her children, grandchild, and other family members regularly.
She also goes to the store as needed.  The ALJ found that these factors support her
assessed mild limitations in activities of daily living and social functioning.

With regard to the ALJ's finding of moderate limitations of concentration,
persistence, and pace, the ALJ noted that plaintiff was able to watch television, have a
conversation, and go to the store and complete her shopping as needed.  In addition,
plaintiff's function report indicated that she could pay attention for a "long time" and that
she finished what she started, as long as she could take breaks.  Furthermore, plaintiff
testified that she babysits her four-year old grandchild from time to time (2010
testimony).  Also, during Dr. Valette's examination, plaintiff recalled three of three items
immediately and two after a five-minute delay, could not perform serial sevens but
correctly completed serial three calculations and spelled the word "world" backwards
correctly.  The ALJ found that these factors, in combination with plaintiff's use of
medications, support the finding that plaintiff is moderately limited in the ability to
maintain concentration, persistence, and pace, which she noted is reflected in her

subsequent RFC assessment.  (Docket No. 10-9 at 22).

The ALJ further noted that she considered whether the "paragraph C" criteria of

the above-mentioned mental Listings were satisfied but found that the evidence in this

case did not establish such criteria.  (Docket No. 10-9 at 23).

At step four of the evaluation process, an ALJ must determine a claimant's RFC.

> . . . A claimant's RFC to do work is what the claimant is still
> functionally capable of doing on a regular and continuing basis, despite his
> impairments: the claimant's maximum sustained work capability. The
> decision maker first determines the type of work, based on physical
> exertion (strength) requirements, that the claimant has the RFC to
> perform. In this context, work existing in the economy is classified as
> sedentary, light, medium, heavy, and very heavy. To determine the
> claimant's "RFC category," the decision maker assesses a claimant's
> physical abilities and, consequently, takes into account the claimant's
> exertional limitations (i.e., limitations in meeting the strength requirements
> of work). . . .

> If a conclusion of "not disabled" results, this means that a significant
> number of jobs exist in the national economy for which the claimant is still
> exertionally capable of performing. However, . . . [t]he decision maker
> must then consider all relevant facts to determine whether the claimant's
> work capability is further diminished in terms of jobs contraindicated by
> nonexertional limitations.

> . . .

> Nonexertional limitations may include or stem from sensory
> impairments; epilepsy; mental impairments, such as the inability to
> understand, to carry out and remember instructions, and to respond
> appropriately in a work setting; postural and manipulative disabilities;
> psychiatric disorders; chronic alcoholism; drug dependence; dizziness;
> and pain. . . .

Williams, 844 F.2d at 751-52.  In deciding that plaintiff is capable of making a successful

adjustment to other work that exists in significant numbers in the national economy, the

ALJ had to determine plaintiff's RFC based on all the relevant medical and other

evidence in the case record.  RFC determinations are for the ALJ to make "based on

the entire case record, including the objective medical findings and the credibility of the claimant's subjective complaints." Poppa v. Astrue, 569 F.3d 1167, 1170-71 (10th Cir. 2009). See 20 C.F.R. §§ 416.946, 404.1546 (providing ALJ is responsible for assessing RFC).

Here, the ALJ found that the plaintiff has the RFC to perform sedentary work as defined in the Regulations except that plaintiff requires "simple, unskilled work with a specific vocational preparation (SVP) of one or two; can lift or carry less than ten pounds frequently and ten pounds occasionally; can stand and/or walk, with normal breaks, for a total of two hours in an eight hour day; can sit, with normal breaks, for a total of six hours in an eight hour day; can perform pushing and pulling motions with her upper and lower extremities within the aforementioned weight restrictions; should avoid unprotected heights and moving machinery; requires a 'relatively clean' work environment, meaning one with low levels of pollutants and stable temperatures; can occasionally perform the postural activities of stooping, crouching, kneeling and crawling; should not climb ladders, ropes or scaffolds and can frequently perform overhead reaching with her right upper extremity." (Docket No. 10-9 at 23). The ALJ subsequently expressly considered plaintiff's asserted depression and anxiety. After a review of the medical evidence, the ALJ determined that "[b]ased on the evidence as a whole, considering [plaintiff's] combination of impairments, the [ALJ] limited this individual to less than the full range of sedentary work as described in the [RFC] assessment." (Docket No. 10-9 at 26). The ALJ further determined that plaintiff was unable to perform any past relevant work activity (telephone solicitor and customer service representative). (Docket No. 10-9 at 27). The ALJ noted that as the VE

testified, these occupations were performed at an SVP of greater than two and therefore were precluded by the ALJ's RFC assessment.

At step five, the burden shifts to the Commissioner to show that a claimant can perform work that exists in the national economy, taking into account her RFC, age, education, and work experience. Neilson, 992 F.2d at 1120. Here, the ALJ determined that if the plaintiff had the RFC to perform the full range of sedentary work, a finding of "not disabled" would be directed by the Medical-Vocational Guidelines (the "Grids"). However, since plaintiff's ability to perform all or substantially all of the requirements of sedentary work has been impeded by additional limitations, the ALJ asked the VE whether jobs exist in the national economy for an individual with plaintiff's age, education, work experience, and RFC. In 2010 a VE testified, specifying certain occupations that such an individual could perform. Based on the VE's testimony, the ALJ concluded that considering plaintiff's age, education, work experience, and RFC, she was capable of making a successful adjustment to other work that exists in significant numbers in the national economy, and thus a finding of "not disabled" was appropriate. (Docket No. 10-9 at 28).

## ANALYSIS

### Assessment of Plaintiff's Physical Impairments and Restrictions. Plaintiff

first asserts that her physical impairments were not properly assessed by the ALJ. More specifically, plaintiff contends that the ALJ erred in rejecting the opinions of plaintiff's treating physicians, which allegedly support disability, because they were inconsistent with the other evidence. In this regard, plaintiff notes that Dr. Timms

restricted plaintiff to lifting a maximum of five pounds, limited sitting and standing to two hours each, limited postures to rarely, and limited manipulation to seldom.  Dr. Milligan stated that he agreed with Dr. Timms' restrictions.  According to plaintiff, both doctors are treating physicians.  Nevertheless, the ALJ stated she gave "little weight" to their opinions, and she did not follow the restrictions in Dr. Timms' report, thereby obviously rejecting his and Dr. Milligan's  restrictions.  According to plaintiff, inconsistent evidence only precludes controlling weight and is not a valid reason to reject the treating physician opinions.  Plaintiff argues that "[t]he ALJ improperly denied controlling weight and all weight just because of inconsistent evidence."  (Docket No. 13 at 27).

In addition, plaintiff contends that the ALJ erred in rejecting the opinions of the treating physicians based upon her own lay assessment of the medical records, mischaracterized the treatment notes and used that as an invalid reason to reject the treating physical opinions, and substituted her own lay assessment of the medical evidence for the opinions of the physicians without a proper basis in the evidence to support her RFC finding.  Plaintiff claims that a critical fact is that the opinions of Drs. Timms and Milligan are uncontroverted; no other physician allegedly offered a conflicting opinion of physical restrictions.  Nevertheless, the ALJ concluded that these opinions are entitled to little weight for being inconsistent with notations in the treatment notes of improvement, relief from treatment, lack of acute distress, and continuation of the prescribed medication regimen.  Thus, plaintiff claims, the ALJ challenged the treating physicians' uncontroverted opinions of restrictions due to treatment notes, which she allegedly mischaracterized and interpreted as being rather benign sounding.

Plaintiff asserts that in the decision after remand, the ALJ continued to ignore the

evidence that plaintiff has continuing pain despite medications.  The ALJ allegedly clearly mischaracterized the treatment notes by focusing only on the normal-sounding statements.  In addition, she allegedly improperly concluded that the treatment notes suggest less restrictive limitations than the physicians impose.  Plaintiff contends that there is no evidence in the record to support the ALJ's contention, and, in fact, the record does not even contain a medical opinion with conflicting restrictions or a medical opinion suggesting that the treating physicians' notes do not support their restrictions.  According to plaintiff, "[t]he error is that the ALJ drew improper references from the treating physicians' notes, and challenged the physicians on the meaning of their own medical findings."  (Docket No. 13 at 33).

Plaintiff also contends that the ALJ cannot determine physical restrictions without evidence in the record at which a lay person could look and from which that person could determine limitations.  Plaintiff contends there is no evidence in the record to support the ALJ's conclusion that plaintiff can lift ten pounds as opposed to five.  According to plaintiff, a one-pound lifting difference could have resulted in a finding of disability.  Thus, plaintiff asserts, the ALJ's RFC finding must be specific and must make it clear to subsequent reviewers that her RFC finding has a basis in the evidence or record, which plaintiff claims is not the case here.

Finally, plaintiff asserts that the ALJ found that plaintiff has severe migraine headaches but then failed to evaluate the frequency of plaintiff's severe migraine headaches and did not account for the effects of plaintiff's migraines in her RFC finding.  She did not explain the basis for her belief that the severe migraines would not adversely affect plaintiff's ability to perform sedentary unskilled work and did not offer

any explanation that links any of her RFC restrictions to the migraines.  According to

plaintiff, the ALJ provided her own vocational evaluation of the effect of plaintiff's

migraine headaches instead of posing the limitations imposed by the severe migraine

headaches to the VE to determine their effect on plaintiff's ability to perform work.

Plaintiff asserts that "[t]he limitations from plaintiff's severe migraine headaches are only

in the ALJ's head, which makes review of those findings impossible."  (Docket No. 13 at

20).

"A treating physician's opinion must be given controlling weight if it is supported

by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with other substantial evidence in the record."  Knight ex rel. P.K. v. Colvin,

756 F.3d 1171, 1176 (10th Cir. 2014) (internal quotation marks omitted).  "Where, as

here, the ALJ decides not to give controlling weight to a treating physician's opinion, the

ALJ must decide whether the opinion should rejected altogether or assigned some

lesser weight."  Newbold v. Colvin, 718 F.3d 1257, 1265 (10th Cir. 2013) (internal

quotation marks omitted).  The ALJ must give good reasons for the weight she assigns.

See Watkins v. Barnhart, 350 F.3d 1297, 1301 (10th Cir. 2003).  "Even if an opinion is

not entitled to controlling weight, the ALJ must still weigh the opinion in light of the

factors set forth at 20 C.F.R. §§ 404.1527 and 416.927."  Mendoz v. Colvin, 588 Fed.

Appx. 776, 783 (10th Cir. Oct. 21, 2014).  The factors to be considered are:

> (1) the length of the treatment relationship and the frequency of the
> examination; (2) the nature and extent of the treatment relationship,
> including the treatment provided and the kind of examination or testing
> performed; (3) the degree to which the physician's opinion is unsupported
> by relevant evidence; (4) consistency between the opinion and the record
> as a whole; (5) whether or not the physician is a specialist in the area
> upon which an opinion is rendered; and (6) other factors brought to the

13

ALJ's attention which tend to support or contradict the opinion.

Robinson v. Barnhart, 366 F.3d 1078, 1082 (10th Cir. 2004) (quoting Watkins, 350 F.3d

at 1301).  The ALJ need not explicitly discuss each factor, see Oldham v. Astrue, 509

F.3d 1254, 1258 (10th Cir. 2007), but must be sufficiently specific to permit meaningful

review.  Giuliano v. Colvin, 577 Fed. App'x 859, 862 (10th Cir. Sept. 2, 2014).

Here, the ALJ specifically addressed the opinions of the treating and examining

sources (see Docket No. 10-9 at 26-27), namely Ms. Blinn, Dr. Milligan, Dr. Hardy, and

Dr. Timms with regard to not only plaintiff's alleged physical limitations, but also any

limitations as a result of any mental impairments.  With regard to the medical evidence

of record concerning plaintiff's physical impairments, the ALJ stated:

> Physically, claimant's medical record reveals a history of
> headaches.  Claimant first began reporting headaches and neck pain to
> her primary care facility, Comprehensive Family Care Center before her
> amended alleged onset date (Ex. 3F).  However, she continued to work
> full-time (Ex. 2E).  Steven Milligan, M.D., a physician at that facility
> claimant saw on a number of occasion, provided claimant with Imitrex,
> Vicodin and also administered a series of trigger point injections at
> claimant's request (Ex. 15F, 22F).  Dr. Milligan advised claimant to see a
> neurologist (id.).  Neurological evaluations with Richard Gamuac, M.D., in
> August of 2007 revealed self-reported complaints of headaches for
> several years with associated nausea but no focal weakness, numbness,
> vision problems or vertigo (Ex. 1F).  She also informed Dr. Gamuac that
> her headaches responded to her prescribed Imitrex (id.).  Dr. Gamuac
> ultimately assessed claimant with cluster headaches and prescribed
> Topamax and advised her to follow up in one month's time (id.).
>
> However, claimant did not take the Topamax as prescribed or
> follow up with Dr. Gamuac (Ex. 1F; 3F).  In fact, rather than follow the
> therapy prescribed by the evaluating neurologist, claimant continued on
> her previous regimen of Imitrex and Vicodin along with occasional trigger
> point injections (Ex. 1F; 3F).  Subsequent records from Dr. Milligan, as
> recently as late 2009, only referred to a past history of tension headaches
> and noted that she had been prescribed Imitrex as needed (Ex. 15F).
> Since that time, claimant's reports of headaches have decreased
> markedly and, in June of 2010, Dr. Milligan described claimant as a

healthy appearing patient in no acute distress (Ex. 15F).  Dr. Milligan's 2012 records reveal a past medical history of tension headaches and a prescription for Imitrex on an as-needed basis (Ex. 22F).  The medical evidence described above was not consistent with claimant's allegations and does support the undersigned's conclusion that claimant is able to perform unskilled work at the sedentary level.

As with treatment for her headaches, claimant's treatment for fibromyalgia has consisted solely of pain-management medications (*see* Ex. 12F).  She began seeing rheumatologist Patrick Timms, M.D., in 2006 who noted soft tissue tender points and pain for which the only thing that gave her relief was Vicodin (Ex. 4F).  Dr. Timms ultimately noted a history "suggestive of fibromyalgia" and continued claimant on her previously prescribed Vicodin (*id.*).  Subsequent appointments with Dr. Timms throughout 2006 and 2007 changed claimant's medication to Lyrica and Trazodone (*id.*).  Ultimately, Dr. Timms placed claimant upon the medication Avinza, which, he noted in October of 2009, improved claimant's pain (Ex. 12F).  This treatment record from Dr. Timms also noted that claimant was to continue on trazodone as a sleep aid, but at an increased dose, and to return in six months (*id.*).  Her physical examination recorded tender points but no other findings (Ex. 12F).  This was claimant's last appointment with Dr. Timms, as he apparently "fired" claimant thereafter for missing appointments (Ex. 15F).

After Dr. Timms severed his treating relationship with claimant, she apparently saw only Dr. Milligan or other physicians at Comprehensive Family Care Center (*see id.*).  In fact, claimant saw Dr. Milligan only sporadically (*id.*).  In June of 2010, Dr. Milligan noted depression and fibromyalgia, listing treatment as Lexapro, Naproxen as needed, Prilosec, trazodone at bedtime, and Ultram, 50 milligrams, twice per day (*id.*).  In late 2010, claimant saw Dr. Milligan for an unrelated-issue and medication refills (Ex. 22F).  Similarly, 2011 records documented complaints of mild back pain, reported epidural steroids and, in December of 2011, reported increasing muscle spasm with request of epidural steroid injections (*id.*).  Physical examination documented an individual in no acute distress, gait within normal limits and instructions to continue on her prescribed therapy (*id.*).  The claimant presented with the same complaints in May of 2012, but was again described as in no acute distress with normal gait and continued on her prior therapy (*id.*).  The objective evidence clearly demonstrates relief from her prescribed treatment, large gaps in treatment and repeated notations of no acute distress (Es. 22F).  Based upon the evidence as a whole, considering claimant's combination of impairments, the undersigned limited this individual to less than the full range of sedentary work as described in the [RFC] assessment.

(Docket No. 10-9 at 26).

The ALJ then stated that in reaching the above determination, she had considered and allocated the weight to the medical opinions by following the requisite two-step analysis (whether the treating physician's opinion was well-supported by medically acceptable clinical and laboratory diagnostic techniques, and if so, whether the opinion was consistent with the objective medical evidence in the file).  (Docket No. 10-9 at 26).  With regard to plaintiff's physical impairments, she stated that she reviewed the assessments of Dr. Timms and Dr. Milligan as required by the remand order (Ex. 13F; 18F).  (Docket No. 10-9 at 27).  She noted that Dr. Timms' treatment records document improvement in symptoms as a result of prescribed medications (Ex. 12F), which the ALJ found to be inconsistent with his letter in April of 2009 that plaintiff has not received benefit from medication (Ex. 12F).  The ALJ further found that the questionnaire signed by Dr. Timms but apparently completed by another individual and the questionnaire signed by Dr. Milligan indicating agreement with Dr. Timms' assessed limitations are inconsistent with the treatment records from Dr. Timms and, later, Dr. Milligan (Ex. 7F, 12F, 15F, 22F) (Docket No. 10-9 at 27).  The ALJ stated that these records "document relief from treatment, repeatedly note [plaintiff] was in no acute distress and continue her on her prescribed medication regimen."  (Docket no. 10-9 at 27).  She stated that "[t]he totality of these records and the inconsistencies with the questionnaires lead [me] to find that Dr. Timms and Dr. Milligan's questionnaires are not entitled to controlling weight and, in fact, due to the numerous inconsistencies between the treatment records and the questionnaires, [I] give[] them little weight."  (Docket No. 10-9 at 27).

16

This court finds no reversible error in the ALJ's evaluation of the treating physicians' opinions and her assessment of the plaintiff's limitations. The ALJ performed the required analyses, and the correct legal standards were applied. It may be that she performed the two-step analysis concerning the doctors' opinions in it in the wrong order, but any such error did not affect the outcome of the case, and thus would be harmless error. See Garcia v. Colvin, 2014 WL 3953139, at *11 & n.2 (D. Colo. Aug. 13, 2014). The ALJ's analysis of the doctors' opinions and conclusion that they are entitled to little weight are not legally deficient nor inconsistent with the substantial evidence in the record. As the ALJ noted, the doctors' treatment notes repeatedly noted few, if any, abnormal examination findings. Although plaintiff had worked full time through April 2007, Dr. Timms opined in November 2009 that plaintiff's impairments had been at the severity levels he described since 2004. Dr. Milligan's October 2010 opinion, in which he simply stated that he agreed with Dr. Timm's opinion, provided no additional explanation. The court notes that plaintiff argues that the ALJ mischaracterized the treatment notes by ignoring evidence that plaintiff's condition did not improve. The ALJ, however, noted that Dr. Timms tried several medications to treat plaintiff's fibromyalgia but then noted in October 2009 that plaintiff reported her pain has improved on Avinza. The only record that is dated after this report indicates worsening depression (AR at 384), which does not support Drs. Timms' and Milligan's opinions regarding plaintiff's physical limitations. Furthermore, while plaintiff argues that the ALJ improperly substituted her opinion for that of the treating physicians, it is the ALJ's job to determine whether a physician's opinion is supported by his own treatment records and the record as a whole. See 20 C.F.R. §§ 404.1527, 416.927; White v. Barnhard, 287

17

F.3d 903, 907-08 (10th Cir. 2001) (treating physician's very restrictive RFC assessment was not fully supported by the doctor's limited findings following examination); Castellano v. Secretary of HHS, 26 F.3d 1027, 1029 (10th Cir. 1994) (ALJ discounted treating physician's opinion of total disability which was not supported by his own office records).

Furthermore, even though the ALJ discounted the opinions of Dr. Timms and Dr. Milligan, plaintiff's claim that there is no evidence to support the ALJ's RFC finding is not correct. Neurologist Joseph J. Jares opined that plaintiff could perform sedentary and light work with certain environmental limitations. (AR. 307-10). As defendant points out, this opinion is less restrictive that the ALJ's RFC finding. In addition, it is the ALJ's responsibility, not a physician's, to assess RFC. See 20 C.F.R §§ 404.1546, 416.946; 1996 WL 374183, at *2, 4 (Policy Interpretation). "[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question. [T]he ALJ, not a physician, is charged with determining a claimant's RFC from the medical record." Chapo v. Astrue, 682 F.3d 1285, 1288 (10th Cir. 2012) (internal quotations omitted).

**Deficits in Concentration - Limitation to Unskilled Work.** The ALJ found that plaintiff had moderate limitations in maintenance of concentration, persistence, and pace (Docket No. 10-9 at 22), and her RFC assessment included the limitation to simple, unskilled work with a specific vocational preparation ("SVP") of one or two. (Docket No. 10-9 at 23). The ALJ explained her finding that plaintiff has moderate limitations in maintenance of concentration, persistence, and pace as follows:

    She was able to watch television, have a conversation or go to the store

and complete her shopping as needed . . . .   Her function report also
indicated that she could pay attention for a "long time" and that she
finished what she started, as long as she could take breaks (Ex. 5F).  She
testified that she babysits her four-year old grandchild from time to time
(2010 hearing testimony).  During Dr. Valette's examination, she recalled
three of three items immediately and two after a five minute delay, could
not perform serial sevens but correctly completed serial three calculations
and spelled the work "world" backwards correctly (Ex. 5F).  These factors,
in combination with claimant's use of medications, support the finding that
she is moderately limited in the ability to maintain concentration,
persistence and pace, a finding reflected in the following [RFC]
assessment.

(Docket No. 10-9 at 22).  The ALJ continued later in her decision that in addition to the

above, the medical evidence regarding plaintiff's asserted depression and anxiety do

not support a finding of additional limitations beyond the restriction to work with an SVP

of one or two incorporated in the RFC assessment.  The ALJ noted that plaintiff's

treatment for psychologically-based symptoms since July 2007 (the amended onset

date) have consisted solely of medication.  Plaintiff saw no psychiatrist or therapist

since the alleged onset date other than the psychological consultative examiner, Brett

Valette, Ph.D., who saw plaintiff in April 2008.  After conducting his interview, Dr.

Valette assigned plaintiff a Global Assessment of Functioning ("GAF") score of 65-70,

which indicates only mild symptoms, or mild difficulty, in social, occupational, or school

functioning.  In addition, the ALJ noted that more recently plaintiff saw psychiatrist John

Hardy, M.D., at the behest of her attorney, in July 2010 and sporadically thereafter.  Dr.

Hardy assessed a diagnosis of major depression, and also noted that he believed

plaintiff was seeing him as part of "another attempt at disability."  He suggested that she

include Elavil in her medication regimen and return in a month, though there was no

indication that plaintiff complied with either of these suggestions.  Furthermore, the ALJ

noted that in 2010 Dr. Hardy also commented that "[m]y observation is that she seems to be very composed and capable person."  Thereafter, in April 2011, plaintiff reported an increase in symptoms due to an assault by an ex-boyfriend while intoxicated.  Dr. Hardy recommended that she return to therapy, but there is no evidence that she complied this recommendation.  Dr. Hardy also continued plaintiff on Lexapro and Ambian at that time.  In addition, the ALJ noted that Dr. Milligan's notes also documented a history of depression and prescription for Lexapro, but he continuously noted plaintiff as normal and appropriate and documented no other mental health treatment.

The ALJ also noted that although the remand order notes plaintiff's 2010 testimony that she began seeing Elaine Blinn, L.C.S.W., in 2009, the records do not support this statement because the only record from Blinn is the mental RFC assessment she completed in early 2010–there were no treatment records from Blinn after the alleged onset date.  The ALJ acknowledged that Blinn indicated several marked limitations, primarily in the areas of adaptation and maintaining concentration and persistence, with purported extreme limitations in maintaining attention and concentration for extended periods and the ability to complete a normal workday or workweek without interruption from psychologically-based symptoms, or performing at a consistent pace without an unreasonable number of length of rest periods.  However, the ALJ found that Blinn's assessment is not supported by the record as there are no records documenting Blinn's association with the plaintiff in a professional capacity with the exception of this assessment. (Docket No. 10-9 at 25).  In addition, the ALJ noted that the questionnaire signed by Dr. Milligan (Ex. 18F) purported to agree with Blinn's

assessment, but the ALJ further noted that Dr. Milligan's mental health treatment was limited to prescribing medications (Ex. 15F; 22F).  The ALJ observed that the plaintiff's mental health treatment was instead received from psychiatrist Dr. Hardy (Ex. 19F), who noted that the plaintiff was a composed and capable individual (Ex. 19F).  Based upon the limited nature of Dr. Milligan's mental health treatment and the much more in-depth treatment records from Dr. Hardy, the ALJ found that Dr. Milligan's statement regarding claimant's mental health functioning was inconsistent with Dr. Hardy's treatment records, and thus the ALJ gave little weight to Dr. Milligan's assertion that he agreed with Blinn's assessed mental limitations.  (Docket No. 10-9 at 27).

Plaintiff asserts that the ALJ did not properly account for the deficits in concentration that she found plaintiff to have.  More specifically, plaintiff notes that the ALJ found plaintiff to have moderate limitations in concentration, persistence, and pace due to her anxiety and depression and then said that should found "that at most, claimant's mental impairments result in a restriction to work with an SVP [specific vocational preparation] of one or two as indicated in the [RFC] assessment."  Plaintiff notes that unskilled work corresponds to an SVP of one or two, and thus the ALJ meant to account for plaintiff's deficits in concentration, persistence and pace with a limitation to unskilled work.  Plaintiff claims this error is critical because at step 5 in the sequential process of evaluation the ALJ had the burden to prove that plaintiff retained the capacity to perform a significant number of jobs in the economy.  The ALJ, however, did not couch the RFC restrictions in terms of deficits in concentration, persistence, or pace, which she clearly found plaintiff to have, but instead only restricted plaintiff to unskilled work, as shown in the hypothetical question to the VE.   Plaintiff claims there is no

apparent connection between the skill level of work and the level of concentration, persistence, or pace required to do it.  The VE here was not told that the hypothetical person has deficits in these areas; the VE instead was only told that plaintiff can perform unskilled work (SVP 1-2).  Plaintiff asserts that the problem with this method is that the ALJ, without vocational expertise, improperly made the vocational conclusion that a person with deficits in concentration, persistence, and pace can perform the entire range of jobs classified as unskilled.  Moreover, the ALJ's failure to include these mental restrictions is allegedly fatal to the validity of the hypothetical to the VE.  Plaintiff asserts that common sense tells us that impairment in concentration, persistence, and pace would interfere to some extent with all jobs, not just skilled ones; only a VE could tell the extent to which unskilled jobs would be eroded by memory and concentration deficits.

Furthermore, plaintiff asserts that the ALJ's limitation to unskilled work is not supported by any evidence in the record.  Plaintiff notes that her treating psychotherapist, Ms. Blinn, opined that plaintiff has moderate, marked, and extreme impairments in various areas of mental functioning, and plaintiff's treating general practitioner, Dr. Milligan, stated that he agreed with Ms. Blinn's mental limitations.  In addition, the treating psychiatrist, Dr. Hardy, issued a GAF score of 50; the Commissioner's consultant, Dr. Valette opined that plaintiff had a GAF score of 65-70; and the Commissioner's nonexamining agency psychiatrist, Dr. Ryan, did not believe plaintiff had a severe mental impairment.  Plaintiff thus assets that the medical evidence covers the full range of conflicting evidence, which the ALJ is charged with resolving. Here, however, the ALJ allegedly did not explain how much weight she gave to the

opinions of Dr. Valette or Dr. Ryan, and therefore their opinions (that plaintiff has no

severe mental impairments) purportedly cannot be substantial evidence.  Plaintiff

asserts that indeed, the ALJ did not follow either of those opinions because the ALJ

found plaintiff to have a severe mental impairment of anxiety, contrary to the opinions of

Drs. Valette and Ryan.  Therefore, plaintiff asserts, their opinions are not the evidentiary

basis for the ALJ's RFC finding.

Thus, plaintiff contends that this leaves three other opinions - those from Ms.

Blinn, Dr. Milligan, and Dr. Hardy.  The first two opinions were given no weight by the

ALJ.  With regard to Dr. Hardy's opinion, plaintiff asserts that the ALJ obviously gave it

more weight than to those of Dr. Milligan or Ms. Blinn because the ALJ explained that

Dr. Hardy generated "much more in-depth treatment records" and thus gave Dr.

Milligan's opinion little weight for being inconsistent with Dr. Hardy's records.  Plaintiff

states that the ALJ focused on Dr. Hardy's statement that plaintiff was "a composed and

capable individual," yet the problem is that Dr. Hardy's records and the rest of the

evidence in the record do not help us understand how the ALJ was able to determine

that plaintiff was able to perform simple unskilled work.  There allegedly is nothing in the

record that is informative of the skill level of work that plaintiff is able to do despite her

mental impairments.  Thus the ALJ's finding in this regard is allegedly purely

speculative, and therefore the ALJ's finding that plaintiff can still perform unskilled work,

despite her severe mental impairments, is not supported by the evidence.

This court, however, agrees with the defendant that the ALJ's finding that plaintiff

could perform unskilled work adequately accounted for her credible limitations and that

her determination is supported by substantial evidence.  As noted by defendant, from a

mental perspective, the ALJ found that plaintiff could perform unskilled work with an

SVP 1 or 2.  That RFC adequately accommodated the plaintiff's limitations.  "The GAF

scale is used by clinicians to report an individual's overall level of functioning."  Davison

v. Colvin, 2014 WL 7240066, at *6 & n.4ed (10th Cir. Dec. 22, 2014) (noting that a "GAF

score of 51-60 indicates '[m]oderate symptoms (e.g., flat affect and circumstantial

speech, occasional panic attacks) OR moderate difficulty in social, occupational, or

school functioning (e.g., few friends, conflicts with peers or co-workers).'"")).  Here, the

ALJ was aware of plaintiff's GAF scores as they were noted in her decision.  She noted

that Dr. Vallete examined plaintiff in 2008 and assigned a GAF score of 65-70,

indicating only mild symptoms or a mild limitations in social, occupations, or school

functioning, but generally functioning pretty well (AR. at 438).  Based upon Dr. Valette's

examination, Ellen Ryan, M.D., opined that plaintiff's mental impairments were not

severe.  (AR at 334).  The next evidence of specific mental health treatment other than

medication management by her primary care physician was in July 2010 when plaintiff

saw Dr. Hardy at plaintiff's attorney's request.  (AR at 572-75, 382).  Dr. Hardy noted

normal speech, intelligence, attention, concentration, and memory.  (AR 574-75).  While

he assigned a GAF score of 50, when she asked him to fill out disability paperwork, he

refused, noting "this is really only my 2nd visit with her so I really can't specify much

medical opinion about what she is capable of doing."  (AR at 571).  At that time,

however, he did observe "that she seems to be a very composed and capable person."

(AR at 571).

The court finds no merit to the plaintiff's argument that the RFC assessment did

not accommodate the moderate limitations in concentration, persistence, and pace.  As

24

noted by defendant, these limitations were found at steps two and three of the

sequential process of evaluation (the paragraph B-criteria).  The ALJ was not required

to include moderate limitations from the paragraph B-criteria in her RFC finding.  See

Beasley v. Colvin, 520 Fed. App'x 748, 754 (10th Cir. Apr. 10, 2013) ("The social

security ruling on assessing a claimant's RFC cautions that '[t]he adjudicator must

remember that the limitations identified in the "paragraph B" . . . criteria are not an RFC

assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of

the sequential evaluation process.' . . .   The ALJ was under no obligation to include

limitations in social functioning in [claimant's] RFC based solely on his finding that she

had 'moderate difficulties' in social functioning as part of the distinct step-three

analysis."); DeFalco-Miller v. Colvin, 520 Fed. App'x 741, 747 & n.5 (10th Cir. Apr. 9,

2013).

        Furthermore, the court agrees with defendant that plaintiff's argument that

unskilled work addresses only skill transfer is not accurate.  Under the Commissioner's

policy, an ability to perform unskilled work generally requires these mental activities:

understand, remember, and carry out simple instructions; make judgments that are

commensurate with the functions of unskilled work–i.e., simple work-related decisions;

respond appropriately to supervision, co-workers, and unusual work situations; and deal

with changes in a routine work setting.  SSR 96-9p, 1996 WL 374185, at *9.

**CONCLUSION**

        This Court finds that the ALJ's decision was supported by substantial evidence

and the ALJ committed no legal error in reaching her adverse finding.

        **WHEREFORE**, for the foregoing reasons, it is hereby

25

**ORDERED** that the ALJ's denial of disability benefits is **AFFIRMED**.  It is

**FURTHER ORDERED** that each party shall pay its own costs and attorney fees.


Date:  March 11, 2015                                    s/ Michael J. Watanabe
       Denver, Colorado                             United States Magistrate Judge